ROHLFS *v.* TOWNSHIP OF FAIRGROVE.

1. Negligence—Highways and Streets—Burden of Proof.

It is fundamental, in all actions for negligence, that the plaintiff has the burden of showing that he was free from contributory negligence: and in considering that question as an issue of law, the testimony of plaintiff and his witnesses is to be taken as true and construed in the light most favorable to plaintiff.[1]

2. Highways and Streets—Contributory Negligence—Notice.

It is not contributory negligence, as matter of law, to travel on a defective highway in the night, with knowledge of the danger; but having such knowledge, it is the duty of the traveler to govern himself accordingly, and to exercise such caution as an ordinarily prudent man, having like knowledge, would exercise under the same circumstances.

3. Same—Dangerous Way.

To adopt the more dangerous of two known ways of doing a particular thing, because it is more convenient than the safer way, is contributory negligence.

4. Same.

Where plaintiff was driving along a highway approaching a culvert, at which washouts had occurred, narrowing the traveled portion of the road and rendering the place highly dangerous, as plaintiff, who lived near at hand, knew very well, and he drove along the highway without getting out of his vehicle, or making use of a lighted lantern that he had with him, and was injured by falling into a washout, he was guilty of negligence, barring his recovery for the negligence of the township in suffering the highway to remain in a defective condition.

5. Same.

Without some proof that he did not know the exact location or nature of the defects, or, knowing them, was taking every precaution to get by them safely, or that fright of his team, storm, sickness in his family, haste to reach home, or some other distracting anxiety, or even temporary forgetfulness of the danger, diverted his attention from it, plaintiff must be held to have been negligent.

---

[1] Contributory negligence as affecting liability of municipal corporations for defects and obstructions in streets, see note in 21 L. R. A. (N. S.) 614.

Error to Tuscola; Beach, J. Submitted October 15, 1912. (Docket No. 64.) Decided April 8, 1913.

Case by Diedrich H. Rohlfs against the township of Fairgrove for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed; new trial refused.

*Quinn, Wixson & Quinn,* for appellant.

*H. H. Smith,* for appellee.

STEERE, J. This action was brought to recover damages for injuries alleged to have resulted from an accident occasioned by a defective highway in the defendant township of Fairgrove.

Plaintiff recovered a verdict and judgment in the circuit court of Tuscola county, and defendant has removed the proceedings to this court for review, chiefly upon the ground that the undisputed testimony clearly establishes, as a matter of law, that plaintiff was guilty of contributory negligence, and a verdict should therefore have been directed for defendant.

It is conceded by defendant's counsel that plaintiff's testimony was sufficient to clearly raise an issue for the jury upon the negligence of defendant in not maintaining the highway in question in a reasonably safe condition for travel at the point where the accident is alleged to have occurred; but, regardless of that issue, it is contended that plaintiff was perfectly familiar with the locality and its condition, and by his own testimony discloses such contributory carelessness at the time and place of the accident as to preclude recovery.

Plaintiff, a farmer, 41 years of age, is a resident of Fairgrove township, Tuscola county, where he has spent most of his life. His home at the time of the accident in question was on his farm, situated about 4½ miles east of the village of Fairgrove on a public highway extending from said village to and beyond his home. A culvert or bridge with cement abutments and plank floor, between

five and six feet wide, with no railings on the sides, crossed this highway at a point about one-half mile west of his home and four miles east of the village. It spanned a county ditch which, running along the north side of the highway from the west, crossed to the south side at that point, continuing on to the east along the south side of this highway. At the angles where the ditch turned in crossing, the water had washed out the earth, enlarging the channel so as to form what the witnesses called "holes" on each side of the road at each end of the culvert; the one on the south side being deepest and largest. The ditch at the south end and east side of the culvert was between six and eight feet deep. This hole or washout at the southeast corner of the culvert extended from the face of the abutment into the wrought portion of the road 3 feet 9 inches, and easterly 6 or 8 feet, dropping down 18 inches from the top of the cement at the east edge of the culvert, and inclining thence to the bottom; the water being about 3 feet deep. There was also a hole at the northeast corner of the culvert which extended into the roadbed about 3 feet, but it was not as deep or as long as the one on the south. There was also a defect at the northwest corner of the culvert of less magnitude, but which had worn into the roadbed, and narrowed it so as to interfere somewhat with travel over the bridge in a straight line. The result of these conditions was to narrow the driveway as it led onto the bridge in both directions, and to throw the safe portions of the opposite approaches out of alignment. To safely drive upon the bridge from the west, it was advisable, if not actually necessary, to keep or swing to the southerly side of the approach to avoid the defect on the north side where the water had eaten into the roadway, and in going off the bridge to the east it was necessary to straighten back and curve to the north to avoid the larger hole worn into the roadway from the south, at the same time guarding against the hole at the northeast. To pass directly along the roadway the margin of safety was small; the width

of the driveway between the holes at the east and west approach, had the holes been opposite each other, would have been but 7 feet. The width of the roadway between the holes at the east approach, where one driving east would leave the bridge, is stated by different witnesses at from 6 to 11 feet. The ditch running along the highway on the north side west of the culvert and on the south side east of the culvert had a varying width of from 18 to 30 feet. This condition of washout, resulting in widening the ditch and narrowing the driveway at the approaches to the culvert, had existed for some time, variously stated by witnesses at from six months to two years. Plaintiff· was very familiar with these conditions, having traveled that highway many times, both night and day "hundreds of times before," he testifies. On the day of the accident which is the foundation of this suit, he had previously crossed the culvert, in going and coming with his team, three times.

On the night of February 25, 1911, while returning home from the village of Fairgrove, driving a team attached to a buggy, plaintiff was precipitated, with his horses and conveyance, into the enlargement in the ditch at the southeast corner of the culvert, as a result of which he alleges serious sickness ensued from the wetting and exposure then experienced. It appears from the testimony of the plaintiff that on the evening in question, between 6 and 7 o'clock, he left his home for the village to get some repairs for a feed-grinder, driving a quiet, gentle team of horses attached to an open buggy. The night was somewhat dark and foggy, and he carried with him a lantern. He left the village of Fairgrove about 9 o'clock on his return home, having lighted his lantern just after leaving the village. He used it for a time; but, finding it unsatisfactory because it dazzled his eyes, finally placed it in the back of the buggy, and did not again use it. His horses were walking, and as he approached the culvert, he knew he was in its vicinity, "about to the culvert," but did not realize that he was right there until his team step-

ped on the planking.  He could not see the way to go along the road, but kept watch " good as I could," and trusted quite a good deal to his horses to pick their way safely.  They would always stop when he wanted them to, upon pulling on the lines or saying " whoa " to them; but, when he discovered that he was at the west side of the bridge, he did not undertake to stop the team, merely trying to pull it to the north a little.  He knew there was a possibility of getting into the holes in question, but did not stop to think much about it; he had frequently passed over this culvert on dark nights like the one in question, and thought he would get over all right; as the team passed over the bridge, the off horse stepped into the edge of the large hole at the southeast corner, floundered ahead, and pulled the other horse, together with the buggy and plaintiff, over, all falling together into three feet of water at the bottom of the ditch.  The near horse fell over the off horse, and the buggy went into the ditch bottom side up, with plaintiff under it.  One horse lay on its side struggling and trying to get up, being entirely under water except its head; the other horse was on the edge of the ditch, raised on her front feet, turned looking towards the buggy, and trying to get out; plaintiff got from under his buggy and out of the ditch as quickly as he could, took off his coat and endeavored to get his team out, but they were so entangled and the tugs drawn so tightly he could not get them loose, and was unable to disentangle and release the horses.  He therefore went to nearby neighbors for help, some 50 rods away.  Returning with assistance, they loosened the horses, and got them out, plaintiff again going into the water.  After his team was out he took them home, two of the neighbors accompanying him.  After taking care of the horses, which were wet and cold, they went back together to get the other property left in the ditch; it being a cold night and plaintiff fearing everything would freeze in.  He returned to his home again about midnight.  As a result of the wetting and exposure he found himself ill the next morning,

and remained so for some time, requiring the attention of a physician and nurse. He experienced a serious illness, resulting ultimately in rheumatism, from which he has not yet recovered.

The foregoing general statement of the case is condensed from the testimony of plaintiff and his witnesses. There was much conflicting testimony touching the alleged defects in the highway and as to how safe it was for travel at the place of the accident, and also relative to the nature, cause, and extent of plaintiff's illness, but those issues would require special consideration only in case plaintiff established *prima facie* as a prerequisite for submitting them to the jury that he was himself exercising due care, and was guilty of no contributory negligence.

It is fundamental in all actions for injuries caused by negligence, that the burden of proof is upon the plaintiff to show, not only that the party sued was negligent, but that he did nothing to contribute to the accident, was himself exercising due care and caution, and was free from fault or contributory negligence.

In considering that question as an issue of law, the testimony of plaintiff and his witnesses is to be taken as true and construed in the light most favorable to him.

Plaintiff was not guilty of negligence in traveling the highway in question in the night, even though he knew it was defective. It is not contributory negligence not to look out for danger when none is to be expected, but when a traveler along a highway on a dark night knows he is approaching, and about to cross, a defective and dangerous place, it is his duty to govern himself accordingly and exercise such reasonable caution and care as ordinarily prudent men with like knowledge would exercise under like circumstances, in default of which his own negligence bars him from recovery.

Plaintiff lived near this culvert, had crossed it hundreds of times, and had absolute knowledge of its condition. It was familiar to him as his own dooryard; and when

brought by memory into his field of consciousness he had a mental photograph of every defect and danger. He testified that on the night in question, had he stopped his team and alighted, he might have crossed safely, and would have had no trouble had he used his lantern; that his sight was good, and his mind was alert, and he knew the place was extremely dangerous. On those subjects he testifies, amongst other things, as follows:

"*Q.* Now this crossing and culvert you were entirely familiar with?

"*A.* Yes.

"*Q.* Did you consider it a dangerous place?

"*A.* Yes.

"*Q.* An extremely dangerous place?

"*A.* Yes.

"*Q.* To cross?

"*A.* Yes.

"*Q.* But you had crossed over it a great many times?

"*A.* Yes.

"*Q.* How often?

"*A.* Oh, I can't say.

"*Q.* How many times had you crossed over it that day?

"*A.* Three times; that was the fourth.   *   *   *

"*Q.* So that you knew all about these holes?

"*A.* Yes.   *   *   *

"*Q.* Trusted a good deal to your horses?

"*A.* Yes.   *   *   *

"*Q.* You didn't realize you were at the culvert until the team got on it?

"*A.* No.

"*Q.* But you knew you were in that vicinity?

"*A* Yes.   *   *   *

"*Q.* You didn't undertake to stop the team when they got on the culvert?

"*A.* No; I tried to pull them to one side.

"*Q.* To pull them to one side, but to keep on?

"*A.* Yes.   *   *   *

"*Q.* Of course, if you had had a light at the head of the horses, you could have got across all right?

"*A.* I think so.   *   *   *

"*Q.* You thought you could make the crossing, and that the horses would pick their way across?

"*A.* I thought I could cross; in fact, I don't know as I

thought very much about it. I had been in the habit of going that way and thought I was going to make it all right.

"Q. You knew if the horses didn't keep in the road there was a possibility or a chance of their getting into these holes that you speak of, didn't you?

"A. Yes.

"Q. You thought you would take a chance in getting over?

"A. I don't know as I thought anything about a chance.

"Q. As a matter of fact, you did take a chance?

"A. Yes; under the circumstances. * * *

"Q. You knew that you absolutely could make that point secure if you got out and led your horses across, you could have got across safely?

"A. Yes; if I had used the lantern, I could have led them across there.

"Q. All right?

"A. Yes."

While it is true that knowledge of danger, though always an important element, does not necessarily preclude recovery and even temporary forgetfulness of known danger has been held not to be negligence *per se*, the claim of temporary forgetfulness predicated on plaintiff's statements, "I don't know as I thought much about it," and "I don't know as I thought anything about a chance," cannot be sustained against his positive testimony as to what he did think and did do or not do.

He testified his mind was alert and his sight was good. As his "perfectly quiet" horses, under perfect control, walked along the familiar highway, he kept as good watch as he could, he knew he was in the vicinity of, and "about to the culvert," which he considered an extremely dangerous place. Though he did not realize he was right there until his horses stepped on the planking at the west approach, he did then realize, and know, just where he was. With his familiar knowledge of the situation he mentally saw the holes across the bridge and all the extremely dangerous conditions of which he testifies, as plainly as though

it had been daylight, and he knew the perils which were about to be encountered just ahead and after he crossed the bridge.   He knew, if his statement and that of his witnesses is true, that to pass safely he must curve to the left on leaving the bridge in order to miss the hole into which he fell at the southeast corner, and must drive on a high, narrow roadway, only about six feet wide, between the holes, a failure to avoid either of which meant disaster.   He had a lantern which he had previously lighted, sitting in the back of the buggy, though he states he cannot say whether it was then burning, and, with no proof of storm, anxiety to get home, fright of his horses, haste, or other occasion for anxiety, except the defects in the highway, he was in perfect control of a quiet team, then walking, which would stop when he pulled on the lines or said "whoa" to them, yet he "tried" to pull his horses "to the north a little" and kept right on, endeavoring in the dark to drive by a necessary curve onto and along this narrow way, as one blindfolded, when, according to his own testimony, he had it within his power and easily available to make the passage in safety.   Under those circumstances he says he took a chance, thinking he was going to make it all right.

Where there are two known ways of doing a particular thing, one safer than the other, to adopt the more dangerous one because more convenient, and thus voluntarily increase the hazard, is contributory negligence in case of accident.

Certain of the language found in the case of *Conrad* v. *Upper Augusta Township*, 200 Pa. 337 (49 Atl. 770), can well be applied to the undisputed facts in this case. There the plaintiff was driving in the darkness of early morning, along a highway, with which he was familiar, running through a hilly country.   He had attached a lighted lantern to the front of his wagon to enable him to see the highway ahead.   When he reached the summit of a hill approaching a portion of the road flanked by an em-

bankment the light in his lantern went out. Instead of relighting it, he allowed his team to continue, and, failing to keep the beaten track, then went too close to the edge and over the embankment. The court held he was so well acquainted with the road that he must have known he was approaching that portion of the way which, owing to the embankment, was dangerous. Amongst other things it is said:

"The plaintiff was traveling quietly along the road, just before the accident. It was so dark that prudence had suggested to him the necessity for a light. For some reason, the light went out. Obviously, the prudent thing for him to have done would have been, to stop immediately, and relight the lantern. As he did not choose to do so, and, knowing the road as he did, he must be presumed to have taken the risk of his horses going over the embankment and falling down the slope."

Were it shown in this case, or could it be claimed from the testimony, that plaintiff, even though he knew the highway was defective, did not know the exact location and nature of the defects, or that, knowing them, he was taking precautions accordingly and doing all he could to get safely by, or that fright of his team, storm, sickness in his family, and haste to get home, or any other distracting anxiety occupied his thoughts and diverted his attention, or even that he temporarily forgot that there were defects in the road, this question would fall within that numerous class of cases where contributory negligence is an issue of fact for the jury; but this case is of that class where a defect, the full nature of which was well known to the plaintiff, was in his mind at the very time of the injury, and could have been avoided by due care. This distinction is clearly pointed out by Chief Justice MONTGOMERY in the case of *Vergin* v. *City of Saginaw*, 125 Mich. 499 (84 N. W. 1075). Referring to certain cases there cited, the court said that in each of those cases in which plaintiff was held guilty of negligence, as a matter of law, "the defect was in the mind of the plain-

tiff at the very time of the injury." In the case of *Grandorf* v. *Railway Co.*, 113 Mich. 496 (71 N. W. 844), which was one of the cases referred to, it was said:

"If this had been a defect of which the plaintiff merely had had previous knowledge, and which knowledge was not in her mind at the time, or if her attention had been diverted from the obstruction, there would be ground for the plaintiff to stand upon."

Plaintiff's own evidence shows conclusively that he was taking a chance for convenience, rather than go to the trouble of taking the precautions which he states would have insured a safe passage by the defects, and was not exercising that degree of care which a reasonably careful and prudent man should and would ordinarily exercise, with like knowledge, under like circumstances, pointing irresistibly to the conclusion that his own negligence contributed to the accident of which he complains.

With the burden of proof resting upon plaintiff to show, before he can recover, that he himself did nothing to contribute to the accident, and is himself free from negligence, he has not only failed to establish the same *prima facie*, but rather has made proof to the contrary.

We are therefore constrained to hold that the judgmen' must be reversed, and no new trial ordered.

MOORE, MCALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.