FALAHEE *v.* CITY OF JACKSON.

MUNICIPAL CORPORATIONS—HIGHWAYS AND STREETS—NEGLIGENCE
  CONTRIBUTORY NEGLIGENCE—DIRECTED VERDICT.

In an action against a municipality and a railroad company for personal injuries caused to plaintiff by being crushed against a bridge over a public street, under which he attempted to pass while riding on top of a load of hay, where it appears that he could easily have ascertained whether or not he could safely pass under, but failed to do so, he was guilty of contributory negligence, as a matter of law.

Error to Jackson; Williams (Benjamin), J. Submitted October 21, 1920. (Docket No. 98.) Decided December 21, 1920.

Case by Thomas J. Falahee against the city of Jackson and the Michigan Central Railroad Company for personal injuries. Judgment for defendants on a directed verdict. Plaintiff brings error. Affirmed.

*James J. Noon* and *Richard Price*, for appellant.

*Lyman B. Trumbull*, for defendant city.

*Cobb, Bisbee & Wilson* (*Frank E. Robson* and *J. W. Dohany*, of counsel), for defendant company.

*Thomas E. Barkworth, amicus curiæ.*

MOORE, C. J. The plaintiff is a farmer 37 years old. On the 28th of October, 1916, he brought a load of hay to the market in Jackson. The main line of the Michigan Central railroad passes over Mechanic street on a bridge. Just north of this overhead bridge, a distance of about 25 feet, the Valley branch of the Michigan Central railroad passes over Mechanic street at grade, and is guarded by gates operated by a man who stood on the west side of the street. Plaintiff while sitting on the top of his load of hay undertook to drive under the overhead bridge on Mechanic street. There was not sufficient room for him to do so. He was struck by the under side of the bridge and received permanent injuries. He claimed both defendants were guilty of negligence, and brought this suit to recover damages.

After the testimony offered on behalf of plaintiff was closed both defendants asked for directed verdicts. The trial judge was of the opinion that plaintiff was guilty of contributory negligence, that he did not file his notice of claim against the city in time to entitle him to recover, and that the defendant railroad company was not shown to be guilty of negligence, and directed a verdict in favor of both of the defendants. The case is brought here by writ of error, it being the claim that under the proofs the case should have been submitted to the jury to say whether plaintiff was guilty of contributory negligence; that the necessary notice had been given and that the trial judge was not warranted in saying, as a matter of law, that the

railroad company was not negligent. An overhead bridge had been maintained at this point more than 50 years. No substantial changes had been made in its condition, or that of the street under it for 10 years or more.

It may be well now to refer to the testimony of the plaintiff:

"After leaving the city scales, I drove along Michigan avenue to the corner of Pearl and Mechanic streets, and then north on Mechanic street.

"Q. Tell us about that, Mr. Falahee, from the time you started toward the north on Mechanic street, just what occurred.

"A. Well, when I was at the north line of the river bridge, that I would think is approximately 200 feet or 225 from the overhead bridge, as I got to the north line of the river bridge, there was an engine and two box cars went west on the Valley road, on the surface track. And the gate tender lowered the gates and the train and the two box cars passed over to the west.   *   *   *

"He saw me with this load, or coming with the hay. Then he lowered the gates again to the pavement so this little rod which steadied the gates touched the pavement momentarily; then he looked in the direction in which the train had gone, raised the gates there probably half or two-thirds of the way, I should say; then he lowered them so that the rod touched the pavement as it did a short time, then up again half or two-thirds of the way, and stopped and paused for a moment, then raised them from there on up. The first time he raised the gates, I should say, I was perhaps 100 feet from this overhead bridge, and the last time he raised them I was right at the bridge; you might say I was right at the head of Clinton street. The last time he raised the gates he raised them from an upper position.

"Q. Where were you at that time? Where was your team?

"A. Right at the bridge. The team was under the bridge when he raised them from this upper position.

"Q. Go on and tell us what happened.

"A. Well, sir, the bridge was right there in front of

me, and I didn't even have time to put up—I saw the bridge and just did like that (indicating), and when I did that, there is an iron girder, I should say, perhaps it is nine inches square—I couldn't be positive—and then there is iron rivets with big round heads on, like big bolt heads, that stick down on the under side of the big iron girders. There are three of those girders, one on the south side, one in the center and the third on the north side. Then there are iron braces which run crosswise like this (indicating), then ends resting on these heavy iron girders, which take the place of ties the track sits on if it was a surface track. The first iron girder which I spoke of caught me here in the back of the head and put my face right around between my shoes like that. I was sitting about 3 feet back from the standard at the right-hand side of the binding pole, and there was a pitchfork—the tines were sticking into the hay like that (illustrating), right in line with my body, right back of where I was sitting, and this other iron girder which I spoke of, which is in the center of the bridge, caught me over the right eye and doubled me over backwards and twisted my arms about in this manner (indicating), and jerked them up and around and paralyzed my arms, and this same iron girder brushed the pitchfork that was in line with my body and laying flat on the hay off onto the pavement, and paralyzed my arms and I lost my reins. Then it just twisted and pulled me every way, a regular crushing process, a good deal like being under a big press and being squeezed tighter and tighter all the time, for the reason that the clearance is much less as I progressed toward the north. For that reason I was getting crushed worse. As soon as the load pulled out from under the bridge I started to raise myself. I just raised myself up on my right elbow, and I saw I was injured and I couldn't raise. I had to lay back. Somebody coming along walked out and took the horses by the bit and said 'Whoa.' * * *

"The fork that I spoke of was lying flat on top of the load of hay before the accident; the tines stuck down in the hay so the handle would lie flat. I was about three feet back from the front end of the load of hay, I should say; sitting on the right-hand side of the binder pole, and the fork was right behind me.

"This was an iron bridge. I have measured it since

the accident and this is what I made it: South side, 11 feet ½ inch; center, 10 feet 6¾ inches; north side, 10 feet 5 inches. I measured from under side of the girders to the pavement."

Cross-examination by Mr. Cobb:

"I have known of the Mechanic street bridge for many years. Have driven under it many times. Have also driven under the Jackson street bridge.

"Q. You never reached the conclusion that that bridge was too low, did you?

"A. No, sir.

"Q. Always thought it was high enough?

"A. Yes, sir.

"Q. When did you take into account the height of the bridge and conclude it was high enough?

"A. Why, I never gave it a thought, Mr. Cobb.

"Q. I thought you said you did think it was high enough. Didn't you say so?

"A. Yes.

"Q. When did you reach that conclusion?

"A. Always I had the opinion it was high enough.   *   *   *

"Q. How high is the Mechanic street bridge at the south side. You have the figures there, haven't you?

"A. Eleven feet ½ inch, as I remember it at the south side.

"Q. This is one and a half inches higher?

"A. According to this measurement.

"Q. Do you think you were squeezed by one and one-half inches down there?

"A. Positive of it.

"Q. Do you think one and one-half inches did you the damage?

"A. The farther I progressed the more damage I got.

"Q. Were you damaged at all when you first went under the bridge?

"A. Yes, sir.   *   *   *

"Q. You saw the bridge when you were 200 feet or more to the south of it?

"A. Yes, sir.

"Q. You assumed it was the same height as the Jackson street bridge under which you had passed?

"*A.* Yes, sir.

"*Q.* Consequently assumed, Mr. Falahee, that you could go under there with safety the same as you had under the Jackson street bridge?

"*A.* Yes, sir.

"*Q.* So until you were struck you gave no attention whatever to the height of the bridge?

"*A.* No, sir.   The train going over the crossing was moving slowly.   I traveled probably 100 feet while the engine and cars were passing over the crossing, and that brought me somewhere about midway between the river bridge and the railroad.   My team was walking on a good, stiff walk.   It was a perfectly gentle team.

"*Q.* You could have stopped the team anywhere with perfect safety on the street?

"*A.* Yes, sir.   They were not excited or unmanageable in the least.   The cars had passed out of sight when the gateman proceeded to raise the gates.   He raised them half or two-thirds of the way up.   *   *   *

"*Q.* Where had you got when he lowered the gates that time?   That is, the second time the gates came down and touched the pavement, as you have testified? Where had the team got that time?

"*A.* That was the second time they came down, you claim?

"*Q.* Yes.

"*A.* Well, the second time I was within 60 or 100 feet of the bridge.

"*Q.* You were the first time when the gates went up.   You say you were at the head of Clinton street?

"*A.* The first time I was within a hundred feet. * * *

"There has been some kind of a bridge there all my life, ever since I can remember, coming to the city when I was a child."

Cross-examination by Mr. Trumbull:

"The Valley track is about 20 feet north of the bridge.   The grade of the Valley track is higher than the grade of Mechanic street as it goes under the bridge.   There is kind of an approach up to the Valley track.   It doesn't make a steep grade.   It begins to raise somewhere along there about the second girder,

and from there on gradually raises until you get over the track."

Redirect-examination by Mr. Price:

"*Q.* I think Mr. Cobb asked you the question, 'You claim this bridge is one and one-half inches too low,' and you answered yes. What did you mean by that?

"*A.* I meant it was an inch and a half too low for that load I went under there with. * * *

"*Q.* Now, he put this question to you: 'You paid no attention to the bridge until you got struck,' and you said no. I think that was the question and answer. Is that correct?

"*A.* It couldn't be correct because if I hadn't paid strict attention it would have struck me in the face, instead of back of the head. I certainly must have paid attention before I ducked to go under.

"*Q.* Then, is it true you paid no attention at all until you got hit?

"*A.* No. * * *

"*Q.* Had you driven under this bridge before with a load of hay?

"*A.* No, sir.

"*Q.* Or with a load of anything as high as a load of hay?

"*A.* No, sir." * * *

Recross-examination by Mr. Cobb:

"*Q.* How close would you have to get to the bridge before you could tell whether you could go under there safely or not?

"*A.* This is the question, how close would I have to be to determine whether it was high enough for me to go under?

"*Q.* Yes.

"*A.* Is that the question?

"*Q.* Yes.

"*A.* A man could tell when he was back 20 feet, perhaps.

"*Q.* Have you got that as you want it, so you don't want to change it any more?

"*A.* I think I have, Mr. Cobb.

"*Q.* You want to have it a man could tell when he got up within 20 feet of that bridge, if he was paying

attention, whether or not he could safely go under it
or not?

"*A.* Yes, I would say so."

The testimony of the plaintiff discloses that he knew
about the bridge, about the size of his load of hay, and
that he was approaching an overhead bridge that he
could see clearly, but it is claimed that his attention
was diverted by the lowering and lifting of the gates
so that he is relieved from negligence in proceeding
with his load without ascertaining whether there was
sufficient clearance so that he could do so with safety.
Counsel say:

"The attention of the plaintiff Falahee was neces-
sarily diverted to the railway track which crossed on
the surface because of the passing of an engine and
some cars and the operation of the gates. It is held
that under such circumstances the question of contrib-
utory negligence in not seeing and avoiding danger
is a question of fact for a jury. See 5 Thompson on
Negligence, § 6240.     *     *     *

"We insist that the circuit court erred in this, and
that under all the circumstances it was for the jury to
pass upon question of contributory negligence and that
the circuit judge had no right to say, as a matter of
law, that plaintiff was blamable and the defendants
without fault.

"How can it be said, based upon the record, that
there is indisputable evidence that plaintiff Falahee
was not exercising ordinary care, or that his want of
care contributed to his injury. The record discloses
a question of fact for a jury and is not the basis
when fairly considered for a peremptory instruction
of a court. 5 Thompson on Negligence, § 6252.

"Under the decisions of this State many cases have
been submitted to a jury upon records showing knowl-
edge of a defect or danger on the part of plaintiff.
*Rohlfs* v. *Township of Fairgrove*, 174 Mich. 560;
*Pearll* v. *City of Bay City*, 174 Mich. 652."

A reference to the authorities cited will show them
not controlling of the instant case.

Counsel cite *Vinton* v. *Township of Plainfield*, 208 Mich. 179, as authority for the statement that the highways are made for the use of farmers as well as others. That statement is undoubtedly true, but there is no suggestion in the opinion that farmers, like all other travelers while on the highway, must not exercise the care that an ordinarily prudent man should observe.

In *Harden* v. *City of Jackson*, 137 Mich. at p. 275, Justice HOOKER, speaking for the court, said:

"A man walking on crutches knows the common method of building sidewalks. He knows that the edges of boards decay and knots drop out, and instinctively he learns to avoid putting his crutches in holes or cracks. We think it is not negligence for a city to use its plank walks, although they have cracks and knot holes through which a cane or crutch would go, acting upon the expectation that the traveler must know that they are practically unavoidable, and are common to all sidewalks, long before they are sufficiently worn to justify pulling them up and building anew. The city has a right, in the maintenance of its walks, to expect a reasonable degree of care from all persons; and when its walks are safe for the ordinarily prudent use, there is no negligence. If there were no walks the pedestrian might still fall, and the crutches of the infirm go down in holes made by animals, or in soft places. An accident from such a cause would be a casualty. So, too, there may be casualties upon walks. The cities are not insurers of those who walk on sidewalks, and even though injured without negligence on their part, the same is no more than a casualty if the walk is as good as such person has a right to expect. Such is this accident. As in cases of snow and ice, there is a limit to the duty of the municipality. *Bigelow* v. *City of Kalamazoo*, 97 Mich. 121; *Weisse* v. *City of Detroit*, 105 Mich. 482; *Leslie* v. *City of Grand Rapids*, 120 Mich. 28; *Jackson* v. *City of Lansing*, 121 Mich. 279; *Lee* v. *City of Port Huron*, 128 Mich. 536 (55 L. R. A. 308)."

In *Miller* v. *City of Detroit*, 156 Mich. 630, it was

held the city was not liable because of an injury caused by the dropping of a large dead limb from a tree over the sidewalk.

The law has been stated as follows:

"It may be stated, as the general rule applicable in most situations, that the law does not oblige a traveler on the highway to keep his eyes constantly upon the road before him, to the end that he may avoid being injured by any defect that may possibly exist therein. He may rightfully assume, in the absence of knowledge to the contrary, or in the absence of visible obstructions, or some circumstance sufficient to put him on inquiry, that all parts of the road, street, or sidewalk, improved and intended for public travel, are in a fit condition for such use; and the law does not make it blameworthy in him not to anticipate negligence in those whose duty it is to keep the highway in repair." 5 Thompson on the Law of Negligence, § 6238.

The inference may be fairly drawn from this statement that if there are visible obstructions they may not be safely ignored. 6 McQuillan on Municipal Corporations, page 5744, reads as follows:

"At the same time, defects may be so obvious that a traveler must see them if he is paying any attention to where he is going, and in such case the failure to observe the defect is generally held to be contributory negligence, on the theory that it is not the act of an ordinarily prudent person." Citing many authorities.

In the instant case the traveler knew he was riding on a load of hay much bulkier than the vehicles or loads usually traveling the highway. He knew he was about to pass under an overhead bridge. He knew that if there was not considerable clearance between the top of the load of hay and the bridge he could not pass in safety while riding on top of the load. He saw the bridge. He knew by stopping his team just before going under the bridge he could ascertain to

a certainty whether he could pass safely. If he had observed he would have known he could not pass under it safely. If he had slipped off his load and driven his team while walking on the pavement he would have avoided all danger. We think the court was quite right in saying, as a matter of law, that his conduct, as testified to by him, was not that of an ordinarily prudent man.

This conclusion makes it unnecessary to discuss the other assignments of error.

The judgment is affirmed, with costs to defendants.

STEERE, BROOKE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.